## THE INIZIATIVA.

### JARVIS et al. v. THE INIZIATIVA.

*(District Court, S. D. New York. April 12, 1892.)*

1. SHIPPING—NEGLIGENCE—CAPSIZING OF LIGHTER—UNAUTHORIZED LOADING.

The crew of a partially loaded lighter received word from the ship which was loading her that the work would not be continued at night, and accordingly they did not return after supper. In their absence the loading of the lighter was completed by the crew of the ship in the evening, and then she was left without watch, in an exposed situation, where she afterwards capsized, from some cause not explained. *Held,* that the ship was liable.

2. SAME—BAILMENTS—LIGHTERMAN NOT AGENT OF CONSIGNEE—DELIVERY OF CARGO—WHEN NOT LEGAL.

A lighterman taking from the consignee of cargo an order on the ship for 100 tons for transportation is not the consignee's agent. The ship acts at her own risk in loading the lighter in the absence of the lighter's crew, without their knowledge or authority, and the cargo so put aboard without authority is not in law received by the lighterman, nor is he accountable for it as a bailee to its owner. *Held,* therefore, that in the above case he could not recover its value.

In Admiralty. Libel for negligently upsetting a lighter.

*Hyland & Zabriskie,* for libelants.

*Ullo & Ruebsamen,* for claimants.

BROWN, District Judge. At about half past 5 o'clock in the morning of October 8, 1891, the libelants' lighter Overton, fully loaded with about 98 tons of sulphur, and made fast alongside the steamship Iniziativa at the Mediterranean pier, Brooklyn, broke her lines, capsized, and sank. The libel was filed to recover damages for the loss of boat and cargo, on the ground that they were upset by the negligence of the Iniziativa.

The libelants were engaged in the lighterage business in the harbor of New York. The consignees of the sulphur gave them an order on the steamship for 100 tons, the capacity of the lighter Overton, to be taken to Gowanus creek. The lighter arrived alongside the Iniziativa in the afternoon of October 7th, and up to a little before 6 P. M. had taken on board 35 tons; namely, 20 tons, which filled the hold, and 15 tons on deck. The loading was done by hoisting the sulphur out of the ship upon a platform erected upon her rail, where the sulphur was weighed by a weigher employed by the consignees, and after being weighed upon the platform, was shot down upon the lighter below.

The bill of lading provided that the sulphur "was to be discharged into lighters which consignee is to furnish as requested by ship, and delivery to be taken day and night as ship delivers." One of the printed clauses of the bill of lading also provided that the consignee was bound to be—

"Ready to receive the goods from the ship's side simultaneously with the ship being ready to unload, either on the wharf, or into lighters, provided with a sufficient number of men to receive and stow the goods; and in default thereof the master was authorized to enter the goods at the customhouse, and

to land, warehouse, or place them in lighter without notice to, and at the risk and expense of, the said consignee of the goods after they leave the deck of the ship."

At about half past 5 P. M. the master of the lighter hailed the ship to know whether there was to be work at night; and the weigher replied, no, that they were to knock off at 6 o'clock. Soon afterwards, the discharge being stopped, the three men on board the lighter made her fast properly alongside for the night and went home.

Work was resumed at 7 P. M. but the lightermen not being present, the foreman on the ship sent down a couple of men to trim the sulphur as it was dumped aboard, and the loading, up to 98 tons, was completed at half past 9, when the men were discharged. The lighter was moved several times while loading in the evening. At half past 5 the next morning the noise of the upsetting of the lighter was heard. No one saw it upset, or testifies to the immediate cause. All the lines that fastened it to the ship were broken.

The libel charges that the sulphur was not properly trimmed. This charge is not sustained by proof. It also charges that the loading during the evening was made without authority or permission of the libelants; and that the lighter was left without necessary watch or attendance. Upon the evidence the case turns upon the fact whether the lightermen were notified that work would go on in the evening; or, if not, whether it was negligence in the ship to leave such a lighter for the night unattended, when fully loaded.

On the first question the evidence is very conflicting. There is no doubt that the weigher, about half past 5 o'clock, told the lightermen that they were not to work in the evening. The ship's men, however, claim that before they left for supper, it was arranged to complete the loading of the lighter; and that the lightermen were present at the interview and were informed of this determination. The lightermen all testify positively to the contrary; and the weigher testifies with equal positiveness that there was no such arrangement before supper, and that it was not until after he had gone to his supper that he concluded to come back. The libelants' superintendent also testifies that between 4 and 5 o'clock in the afternoon, in conversation with one of the stevedore's chief men, in reference to night work, he was told that it was undecided whether work was to go on in the evening; but that if so, the lightermen should certainly be informed.

There is no evidence of any indisposition on the part of the lightermen to work in the evening. It was their duty to do so if required; there was no reason why they should not; and all the evidence on their part points to entire good faith in their intention and willingness and expectation to work at night, if required by the ship. The superintendent's inquiries and arrangement that they should be informed, and their own inquiries at the time, confirm this. On the whole, therefore, I accept the libelants' testimony in this respect, and find that the lightermen left the lighter at about 6 o'clock with no notice that the ship was to work at night, but upon the distinct understanding to the contrary.

In subsequently loading the lighter to her full capacity, and leaving her without attendance for the night, the ship acted upon her own risk. I have no doubt that the lighter was loaded at the stern within a few inches of the top of the rail. She had once before capsized when fully loaded. I give no credit to the guesses of the men employed in the evening to trim the lighter, as no special attention was given by them to this point at the time they left; nor have I any doubt that it was unsafe and improper to leave such a lighter so deeply loaded and liable to capsize through the swells of passing boats, in a place where she was thus exposed.

The ship had no authority to make use of the libelants' lighter as a mere place of deposit of the sulphur under the bill of lading, without the libelants' consent; and they did not consent. The lighter did not belong to the consignees of the cargo, but to the libelants, who were acting under an independent contract, and not as the consignee's agents. Under the order for 100 tons the ship had no right to put the sulphur on the lighter of her own notion, in the absence of the men in charge of the lighter, and in a manner to imperil its safety, or without taking such reasonable care of the lighter as was necessary to protect it from damage in the lightermen's absence. The theory of the boatswain that the lighter first filled from leaking is negatived by the proof that even after raising she was found tight. The probability, therefore, is that she took in water from the swells of passing boats in the early morning, through her exposed situation, in the absence of any watch to guard against such dangers.

The libelants are, therefore, entitled to recover for the damage thus caused to their lighter; and also, I think, for the damage to the 35 tons of sulphur which the lightermen had received on board, since the libelants were undoubtedly bailees of so much of the cargo, and had a lien upon it for their hire. The remaining 63 tons put aboard the lighter without the libelants' knowledge or authority, were never received by them in law, nor did they become accountable for it to the owner. It was never in their care or custody, and they never came under any legal responsibility for it, and hence are not entitled to recover for it. *The City of Paris*, 14 Blatchf. 538; *The City of Macon*, 20 Fed. Rep. 159; and see *Phœnix Ins. Co.* v. *Erie & W. Transp. Co.*, 117 U. S. 323, 6 Sup. Ct. Rep. 750, 1176; *The Sidney*, 23 Fed. Rep. 88, 92.

Decree for the libelants for the items above allowed, with a reference to a commissioner to compute the amount, if not agreed upon, with costs.